## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

RIGHT-NOW RECYCLING, INC.,          Case No. 1:11-cv-364
     Plaintiff,

                                    Weber, J.

     vs.                                Litkovitz, M.J.

FORD MOTOR CREDIT CO., *et al*.,        **REPORT AND**
     Defendants.                    **RECOMMENDATION**

## I. Introduction

On May 2, 2011, plaintiff Right-Now Recycling, Inc. (Right-Now) filed a complaint in the Hamilton County, Ohio Court of Common Pleas against defendant Ford Motor Credit Company, LLC (Ford) seeking the return of a Ford F550 truck and a Ford F250 truck and raising claims of breach of contract, unjust enrichment, and violations of due process and equal protection. (Doc. 1, Ex. 1, State Court Complaint). Ford removed the action to this Court on June 6, 2011, pursuant to 28 U.S.C. § 1332 on the basis of diversity of citizenship of the parties. (Doc. 1). Right-Now subsequently amended its complaint. The amended complaint includes a Fourteenth Amendment due process claim against newly-named defendant City of Blue Ash (the City) and Ohio state law claims of breach of contract and unjust enrichment against Ford. (Doc. 36). On December 6, 2012, the City filed an amended answer to Right-Now's amended complaint and raised cross-claims of breach of contract, promissory estoppel, and indemnification and contribution against Ford. (Doc. 75).

This matter is before the Court on: (1) Right-Now's motion for partial summary judgment against the City (Doc. 94), the City's response in opposition (Doc. 116), and Right-Now's reply memorandum (Doc. 119); (2) Ford's motion for summary judgment (Doc. 120), the City and Right-Now's responses in opposition (Docs. 123, 125), and Ford's reply memoranda

(Docs. 131, 132); (3) the City's motion for summary judgment on its cross-claims against Ford (Doc. 121), Ford's response in opposition (Doc. 124), and the City's reply memorandum (Doc. 130); and (4) the City's motion for summary judgment on Right-Now's due process claim (Doc. 122), Right-Now's response in opposition (Doc. 126), and the City's reply memorandum.  (Doc. 129).[1]

## II. Facts[2]

The following facts are undisputed except where otherwise noted.

1. Right-Now is a recycling business that purchases scrap metals and is owned by Dennis and Michelle Johnson.

2. Right-Now purchased a 2009 Ford F550 truck and a 2010 Ford F250 truck from Ford through identical Vehicle Retail Installment Contracts (the Installment Contracts); Right-Now used these trucks to transport inventory.

3. On December 14, 2010, Banta Electric employees Larry Ratliff and Harry Daugherty brought copper wire belonging to Duke Energy to Right-Now.

4. Right-Now purchased the wire and shortly thereafter Mr. Ratliff was stopped by Duke Energy security personnel at a gas station.

5. Duke Energy security personnel contacted the Blue Ash Police Department and a search warrant was issued for Right-Now's premises.

6. The search warrant authorized the Blue Ash Police Department to seize, among other things, the two Ford trucks.

---

[1]Ford requests oral argument on the instant summary judgment motions.  The parties have fully briefed all pertinent issues and submitted evidence in support of their positions.  Because oral argument would not assist the Court's resolution of these motions, Ford's request for oral argument is denied.

[2]Pursuant to the District Judge's standing order, the parties filed separate proposed findings of fact (Doc. 121, Ex. A; Doc. 122, Ex. A; Doc. 133, Ex. 4; Doc. 136, Ex. 16) and underlined versions of these proposed facts indicating which facts are undisputed.  (Doc. 134, Ex. A; Doc. 137, Ex. 1; Doc. 138, Ex. 10; Doc. 139, Exhs. A, B).  This recitation reflects the parties' representations in these filings.

7. The search warrant was executed on December 14, 2010, and the trucks were seized by the Blue Ash Police Department.

8. During the execution of the search warrant, the Blue Ash police told Mr. Johnson that they were there to "search and seize the property of Right-Now Recycling due to receiving stolen property."

9. The Trucks were seized from Right-Now under a valid search warrant.

10. The Blue Ash Police Department intended to forfeit the trucks and on December 15, 2010, Blue Ash Police Department Detective James R. Kelley, the City's forfeiture officer, began preparing the paperwork to proceed with the forfeiture.

11. Detective Kelley contacted Ford on December 15, 2010 to determine if Ford was a lienholder on the trucks and notified Ford of their seizure.

12. On December 16, 2010, Ford confirmed that it was a lienholder on the trucks, which were being purchased by Right-Now pursuant to Installment Contracts, and sent the City two Petitions for Remission or Mitigation of Forfeiture, which confirmed the amount of Ford's liens.

13. The City anticipated that criminal charges would be filed against Right-Now and Dennis Johnson in Hamilton County, Ohio.

14. No state law charges were filed against Right-Now or Dennis Johnson in Ohio because the criminal investigation was adopted by federal investigators for the United States Internal Revenue Service. [3]

15. Assistant United States Attorney for the Eastern District of Kentucky, Robert McBride, instructed the City to retain possession of the trucks during the pendency of the

---

[3] The federal prosecutor filed charges against Dennis Johnson in October 2012 for receipt of property belonging to Duke Energy. Mr. Johnson was found not guilty following a jury trial in March 2013. *See United States v. Dennis Johnson*, No. 2:12-cr-48 (E.D. Ky. Mar. 3, 2013) (Doc. 162).

3

investigation into Right-Now and Dennis Johnson.

16. The City was eventually informed by Mr. McBride that the federal authorities were not interested in forfeiting the trucks.

17. Detective Kelley subsequently contacted Ford representative Barbara Burton and informed her that the City would release the trucks to Ford.

18. Before releasing the trucks, however, the City asked Ford to execute Seized Property Releases that conditioned the release of the trucks on Ford's understanding that, if it returned the trucks to Right-Now, Ford could lose its innocent owner rights.

19. On February 16, 2011, Ford executed a "Seized Property Release" for both trucks, stating that it was the innocent lienholder.

20. Ford also executed and submitted to the City two Hold Harmless Agreements regarding the City's release of the trucks to Ford.

21. The Hold Harmless Agreements provide: "Ford Motor Credit agrees to indemnify and hold you harmless for any liability or claim made against you arising out of your releasing of this vehicle to Automobile Recovery."

22. The Hold Harmless Agreements expressly limit Ford's liability to the value of the trucks. Ford and the City dispute whether the scope of the Hold Harmless Agreements is limited to assuring seizing authorities that Ford will not hold them liable for damage that results upon the release of confiscated vehicles to third-party contractors. Ford and the City further dispute whether the City negotiated the Hold Harmless Agreements with Ford.

23. The City released the trucks to Ford on February 17, 2011.

24. In whole, the City retained possession of the two Ford trucks from December 15, 2010, through February 17, 2011.

25. After the trucks were released to Ford, Right-Now sought to obtain the trucks from Ford.

26. Ford informed Right-Now that it had determined that Right-Now was considered to be in default of the Installment Contracts due to the City's seizure of the trucks.  Right-Now disputes Ford's default determination.

27. The pertinent provision of the Installment Contracts provides: "You will be in default if . . . [y]our vehicle is seized by any local, state, or federal authority and is not promptly and unconditionally returned to you. . . ."

28. Ford informed Right-Now that it would not release the trucks until Right-Now obtained an unconditional release from the City to ensure that Ford did not lose its innocent owner rights as described in the Seized Property Releases.

29. On April 14, 2011, the Deputy Solicitor for the City wrote a letter representing that the City had no further interest in seeking forfeiture proceedings regarding the trucks.

30. Ford returned the trucks to Right-Now on or around May 4, 2011.  Right-Now disputes that Ford's return of the trucks was the result of receiving an unconditional release from the City.

## III.  Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter

of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate

the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving

party. *Satterfield,* 295 F.3d at 615; *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475

U.S. 574, 587 (1986); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir.

2000).

The trial judge's function is not to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at

249. The trial court need not search the entire record for material issues of fact, *Street v. J.C.

Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a

prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and

*Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

**IV. Resolution**

    **A. Right-Now's Due Process Claim against the City**

Right-Now's amended complaint asserts a 42 U.S.C. § 1983 claim against the City for a

violation of its due process rights.[4] *See* Doc. 36, ¶¶ 47-52. Specifically, Right-Now alleges that

the City's failure to provide it notice and an opportunity to be heard prior to releasing the trucks

---

[4]While the amended complaint labels the claim as both a procedural and substantive due process claim, *see* Doc. 36, ¶¶ 47-52, Right-Now's allegations indicate that the claim relates only to the City's alleged failure to provide notice and a reasonable opportunity to be heard. Further, there is no argument raised by any party or any indication in the record that Right-Now's constitutional claim is based on a violation of its substantive due process rights. Consequently, the Court construes Right-Now's due process claim as alleging a violation of procedural due process only.

to Ford constitutes a violation of its Fourteenth Amendment due process rights. (*Id.*). Right-Now moves for summary judgment on this claim, asserting that the undisputed facts establish that the City violated its constitutional rights by transferring Right-Now's property to Ford without providing adequate notice to Right-Now before giving the trucks to Ford. Right-Now contends that the City's actions were undertaken pursuant to official Blue Ash policy and therefore the City is liable for the due process violation under § 1983. (Doc. 94 at 7-11; Doc. 126 at 4-17).[5]

The City maintains, in contrast, that Right-Now cannot establish the elements of its due process claim and the City, not Right-Now, is entitled to summary judgment. The City argues the following: (1) no action was taken by a municipal policymaker such that the City can be held liable under § 1983; (2) Right-Now's alleged damages were not proximately caused by either the City's policy or actions but by Right-Now's own conduct in breaching its contractual agreements with Ford; (3) Blue Ash Policy 19.002, the policy under which the City was acting in releasing the trucks to Ford, is not facially unconstitutional; (4) Right-Now had actual knowledge, *i.e.*, notice, that the trucks were seized, the City intended to forfeit them, and the trucks would not be returned to Right-Now; and (5) Right-Now had an opportunity to be heard because it had two months from the date of the seizure to the date the trucks were released to Ford to assert its property interest in the pending criminal case. (Doc. 116 at 8-20; Doc. 122 at 8-17).

### 1. Municipal Liability Under Section 1983

To establish its § 1983 municipal liability claim, Right-Now must demonstrate that (1) the City was acting under the color of state law, and (2) the City deprived Right-Now of its

---

[5]Right-Now raises similar arguments in both its motion for summary judgment and in its response in opposition to the City's motion for summary judgment. *See* Doc. 94 at 7-11; Doc. 126 at 6-17. Likewise, the arguments raised by the City in its motion and opposition brief are comparable. *See* Doc. 122 at 8-17; Doc. 116 at 8-20. Accordingly, they have been condensed in the Court's summary.

constitutional rights. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998). It is undisputed that the City was acting under the color of state law at all relevant times. *See* Doc. 75, ¶ 48. The Court's inquiry is therefore focused on whether the City's alleged conduct violated Right-Now's Fourteenth Amendment procedural due process rights.

The City contends Right-Now's motion for summary should be denied regardless of the merits of its due process claim because proof of a single incident of alleged unconstitutional activity by a non-policy maker, as occurred in this case, is insufficient to impose municipal liability on the City under § 1983. (Doc. 116 at 15, citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005)). The final decision to release the trucks to Ford was made by Lieutenant Boone of the Blue Ash Police Department – Detective Kelley's supervisor. Lieutenant Boone's unrefuted sworn statements establish that he does not have final authority to establish municipal policy. *See* Doc. 94, ¶ 6. Because neither Detective Kelley nor Lieutenant Boone had final authority to establish municipal policy, the City contends it cannot be held liable for their decision to release the truck to Ford. (Doc. 116 at 14-16; Doc. 122 at 14-15).

Municipalities cannot be held vicariously liable under § 1983 based on the theory of *respondeat superior* for injuries inflicted solely by their employees or agents. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 690-92 (1978); *Gregory v. Shelby Cnty., Tennessee*, 220 F.3d 433, 441 (6th Cir. 2000). To establish its claim for relief under § 1983 against the City, Right-Now must show that its "injuries were the result of an unconstitutional policy or custom" of the municipality. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *see also Monell*, 436 U.S. at 694; *Doe v. Claiborne*

*Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996). *Cf. Polk County v. Dodson*, 454 U.S. 312 (1981)

(municipal policy must be "moving force" behind constitutional deprivation).  In proving the

existence of an illegal municipal policy or custom, a plaintiff may look to: "(1) the

municipality's legislative enactments or official agency policies; (2) actions taken by officials

with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a

custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of

Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

     In this case, Right-Now presents evidence that the trucks, in which Right-Now had a

property interest, were released to Ford pursuant to Blue Ash Policy 19.002[6] without giving

Right-Now prior notice of that action.  The City's argument assumes that Policy 19.002 is

facially constitutional[7] and therefore the only way Right-Now can establish its § 1983 claim

against the City is by showing that the alleged due process violation was the result of a decision

made by a final policymaker, which Right-Now cannot show given Lieutenant Boone's

undisputed affidavit.  The City's argument lacks merit.

     The primary issue presented by Right-Now's motion for summary judgment is whether

the City's forfeiture policy was unconstitutionally applied to Right-Now when the City released

the trucks to Ford without giving Right-Now prior notice.  Whether or not Policy 19.002 is

facially constitutional is irrelevant and does not foreclose a finding that it was unconstitutionally

---

[6] Section 4(a) of the policy provides, in relevant part, that disposition of seized property pending forfeiture will be
by one of the following means:

> Returned to the owner or lien holder or any other party having a bona fide interest without any
> forfeiture proceedings when said action would not be properly taken or would not be in the best
> interest of law enforcement efforts of the Blue Ash Police Department.

Policy 19.002, §4(a).

[7] The City argues that Policy 19.002 is constitutional on its face because it substantially comports with
similar federal "quick-release" statutes and complies with applicable Ohio statutes. *See* Doc. 116 at 11-14; Doc. 122
at 11-14).  However, as stated *infra*, Right-Now's amended complaint does not allege a facial challenge to the City's
policy, but instead challenges the policy as it was applied by Blue Ash police officers.  The Court therefore declines
to address whether the policy is constitutional on its face.

applied to Right-Now. *See Women's Medical Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193-94 (6th Cir. 1997) (laying out the distinctions between facial and as-applied challenges and noting that a statute that is deemed unconstitutional is some applications may still be enforced in other circumstances). Right-Now's constitutional claim arises out of the City's alleged failure to provide notice – not from the release of the trucks or the decision by Lieutenant Boone to allow the release. The cases cited by the City are distinguishable because they address whether a municipality may be held liable for the decisions of its employees in the absence of an official written municipal policy. *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-84 (1986) (holding that municipal liability could be imposed based on single action of County Prosecutor who was acting as the final decision maker for the county, even in the absence of formal written rules that were intended to establish fixed plan of action to be consistently followed under similar circumstances). [8] As the undisputed facts establish that the City's actions in releasing the trucks to Ford were governed by and pursuant to an official City policy – Policy 19.002 – Right-Now need look no further. *See Thomas*, 398 F.3d at 429. Therefore, the City's motion for summary judgment on this basis should be denied.

### 2. Proximate Cause of Right-Now's Injuries

The City also argues that Right-Now is not entitled to summary judgment because it cannot establish that the City's actions proximately caused Right-Now's alleged constitutional injuries. The City argues that "the proximate cause of Right-Now's alleged constitutional

---

[8] Likewise, the City's reliance on *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), is inapposite. *Tuttle* involved whether a municipality could be held liable for actions taken pursuant to an *unwritten* policy or custom of inadequate training of police officers. The Supreme Court held that a single unconstitutional incident was insufficient to establish a custom for § 1983 municipal liability purposes. *Id.* at 823-24. Here, however, Right-Now's claims are based on official Blue Ash Policy 19.002. *Tuttle* is distinguishable and Right-Now may establish its § 1983 due process claim if it can show that the City's policy as-applied to it, even in just a single instance, was unconstitutional.

injuries was the lawful seizure of its trucks" (Doc. 116 at 19) and Right-Now's own conduct in breaching its Installment Contracts with Ford (Doc. 122 at 16).

Causation is a requisite element to any § 1983 claim. *See Deaton v. Montgomery Cty., Ohio*, 989 F.2d 885, 889 (6th Cir. 1993). *See also Gregory v. Shelby Cty.*, 220 F.3d 433, 442 (6th Cir. 2000) (the plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights") (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997)). In this case, the parties' arguments focus on two distinct points in time: when the City initially seized the trucks in December 2010 and when the City turned the trucks over to Ford in February 2011. The City argues that Right-Now's injury stems from the initial seizure of the trucks, which was pursuant to a valid search warrant. In contrast, Right-Now alleges the injury flows from the City's release of the trucks to Ford without prior notice to Right-Now.

The Court determines that the relevant time period is February 2011, when the City released the trucks to Ford. The injuries Right-Now claims stem from a violation of its due process rights under the Fourteenth Amendment, and not from an illegal seizure of the trucks under the Fourth Amendment as the City suggests. The injury Right-Now alleges was caused by the City's alleged failure to give notice; the seizure of the trucks was simply a precipitating event.

The City also argues that Right-Now's own actions proximately caused its alleged injury because Right-Now was in default on its Installment Contracts with Ford upon the seizure of the trucks by Blue Ash police. The City argues that under the terms of the Installment Contracts, a seizure of the vehicles by law enforcement constituted a default, thereby entitling Ford to repossession of the vehicles. The City argues that even if Right-Now had been given the notice

11

and opportunity to be heard that it claims was due, the result would have been the same, *i.e.*, that Ford would have been entitled to possession of the trucks.

The City's argument mistakenly assumes Right-Now no longer retained a property interest in the trucks at the point of their seizure. The Installment Contracts do not state that vehicle title automatically reverts to Ford in the event of the trucks' seizure in connection with a criminal proceeding. Rather, the Installment Contracts provide: "You will be in default if . . . [y]our vehicle is seized by any local, state, or federal authority *and is not promptly and unconditionally returned* to you. . . ." (Doc. 106, Ex. 15-16) (emphasis added). Right-Now presents evidence that it continued to make its monthly payments under the contracts during the time the City was in possession of the trucks, and Ford returned the trucks to Right-Now three months after the City released the trucks to Ford. Therefore, it is not at all clear on the instant record that Right-Now lost all possessory rights to the trucks at the moment of seizure.

In addition, even if Ford had the right to possession of the trucks upon their seizure, Right-Now still retained a property interest in the trucks for purposes of due process. Due Process under the Fourteenth Amendment protects not only those with rights of undisputed ownership, but those having "any significant property interest." *Fuentes v. Shevin,* 407 U.S. 67, 86 (1972) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (holding that, for the purposes of the Fourteenth Amendment, plaintiffs had a property interest in household goods bought under an installment sales contract, even though they lacked title to the goods). *See also Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir. 1999) (lack of title ownership does not necessarily defeat a plaintiff's property interest in a vehicle); *Alexandre v. Cortes,* 140 F.3d 406, 411 (2d Cir. 1998) (holding that a plaintiff who lacked title to motor vehicle nonetheless had a property interest in it, having paid approximately $2,100 of a $3,400 loan); *Maxineau v. City of*

12

*New York*, No. 11-cv-2657, 2013 WL 3093912, at *8 (E.D.N.Y. June 18, 2013) (even assuming title of vehicle reverted directly to bank upon seizure by police, the plaintiff nevertheless retained property interest in vehicle given his $3600 in installment payments towards vehicle's $22,152 purchase price); *Leslie v. Lacy*, 91 F. Supp.2d 1182, 1187 (S.D. Ohio 2000) ("Federal courts have concluded that an ownership interest in a motor vehicle constitutes a protected property interest.") (and cases cited therein). "It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession and use of the goods." *Fuentes*, 407 U.S. at 87 (footnote omitted). The evidence in this case shows that at the time the trucks were seized by Blue Ash police, Right-Now had made a number of installment payments towards the purchase price of the trucks, which gave Right-Now sufficient equity in the trucks to have a property interest under the Fourteenth Amendment. (Doc. 103, Ex. 3). Therefore, the resolution of the contractual issue between Right-Now and Ford has no bearing on whether the City had a duty to provide Right-Now with notice before releasing the trucks to Ford. *See Fuentes*, 407 U.S. at 87 ("[E]ven assuming that the appellants had fallen behind in their installment payments, and that they had no other valid defenses, that is immaterial here. The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing."). Accordingly, the City's motion for summary judgment on this basis should be denied.

### 3. Facial Versus As-Applied Challenge

The Fourteenth Amendment provides, in part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

13

Procedural due process generally requires the State to provide a person notice and an opportunity to be heard prior to depriving that person of a property interest. *Fuentes*, 407 U.S. at 80. *See also Daily Servs., LLC v. Valentino*, 756 F.3d 893, 903 (6th Cir. 2014) ("[T]he right to prior notice and a hearing is central to the Constitution's command of due process.") (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993)). A party alleging a due process claim must first establish that it possessed a protected property interest. *See Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002); *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1108 (6th Cir. 1995). As explained above, Right-Now possessed a protected property interest in the trucks. Therefore, the Court's analysis is limited to whether the City violated Right-Now's due process rights by failing to provide Right-Now prior notice and an opportunity to be heard before releasing the trucks to Ford.

Procedural due process claims challenging official policies can be either facial or as-applied. A facial challenge to a municipal policy seeks "to leave nothing standing, to invalidate the law in each of its applications, to take the law off the books completely." *Connection Dist. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (internal citation and quotations omitted). To succeed on a facial challenge, a plaintiff must demonstrate that "no set of circumstances exist under which the Act would be valid" or that "a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications." *United States v. Salerno*, 481 U.S. 739, 745 (1987). *See also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *Holder*, 557 F.3d at 335. Parties seeking to raise facial challenges bear a "heavy burden." *Salerno*, 481 U.S. at 745. Under an as-applied challenge, however, a plaintiff need only establish that the policy is unconstitutional as-applied to the particular facts of the plaintiff's case. *Women's Medical Prof'l Corp.*, 130 F.3d at 193.

14

The Court determines that Right-Now has raised a procedural due process claim challenging Blue Ash Policy 19.002 as-applied to the particular circumstances surrounding the release of the trucks to Ford, but not as facially unconstitutional. First, the amended complaint does not assert a facial challenge to the City's forfeiture policy. (Doc. 36, ¶¶ 29, 31). Right-Now seeks only monetary relief from the City related to, *inter alia*, costs incurred by Right-Now in obtaining possession of the trucks. (*Id.* at 12-13). Right-Now's amended complaint contains no request that the Court strike down the policy at issue or declare it unconstitutional. In the absence of any explicit allegations clearly challenging the City's policy on its face or a request that the Court strike the policy down, Right-Now's due process claim cannot properly be characterized as asserting a facial challenge. *Cf. Howard v. Whitbeck*, 382 F.3d 633, 640 (6th Cir. 2004) (finding that although the "thrust" of the plaintiff's complaint spoke to an as-applied challenge, the inclusion of a request for declaratory judgment that the statute was unconstitutional was sufficient to raise a facial challenge as well). *See also CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 624 (3rd Cir. 2013) ("[In] a facial challenge, the remedy is the striking down of the regulation. In the case of an as-applied challenge, the remedy is an injunction preventing the unconstitutional application of the regulation to the plaintiff's property and/or damages. . . .") (quoting *Eide v. Sarasota Cty.,* 908 F.2d 716, 722 (11th Cir. 1990) (and cases cited therein)).

Second, Right-Now did not raise a facial challenge to the policy in its summary judgment motion. *See* Doc. 94. Instead, the first mention of a facial challenge appears in the City's opposition brief, wherein the City specifically notes that Right-Now failed to argue that the City's policy was facially unconstitutional. *See* Doc. 116 at 10. Only in its reply brief does Right-Now claim that the City's policy is both facially unconstitutional and unconstitutional as-

15

applied to Right-Now. *See* Doc. 119 at 4, 7. Right-Now cannot cure its failure to clearly allege

a facial challenge by raising the argument in its reply brief. *See Scottsdale Ins. Co. v. Flowers*,

513 F.3d 546, 553 (6th Cir. 2008) ("reply briefs *reply* to arguments made in the response brief –

they do not provide the moving party with a new opportunity to present yet another issue for the

court's consideration.") (internal quotations omitted) (emphasis in original). Because Right-Now

did not raise a facial challenge to Blue Ash Policy 19.002 in its amended complaint or in its

motion for summary judgment, the undersigned declines to address this issue in the first instance.

Accordingly, Right-Now's motion for summary judgment will be construed as raising only an

as-applied challenge to the City's policy.

### 4. As-Applied Due Process Claim

Right-Now contends that Policy 19.002 is unconstitutional as-applied to Right-Now

because there is no evidence that the City notified Right-Now it would be forfeiting Right-Now's

property to Ford prior to actually doing so and there is no evidence that Blue Ash provided

Right-Now with a pre-deprivation opportunity to be heard on the issue. Right-Now cites to the

following evidence in support of its claim: Detective Kelley, the Blue Ash officer responsible

for forfeitures, testified that he released the trucks to Ford pursuant to Blue Ash Policy 19.002

and that he did not notify Right-Now that the trucks were being released to Ford. (Kelley Depo.

at 40). Detective Kelley testified that he followed the policy in only giving notice to Ford as the

lienholder and not to Right-Now. (Kelley Depo. at 43). The City admits that it did not

specifically inform Right-Now that the City was releasing the trucks to Ford prior to February

17, 2011, but states it was not required to do so. (Doc. 94, Ex. 11, RFA #26).

Right-Now's co-owners, Michelle and Dennis Johnson, both testified they did not learn

that the trucks were released to Ford by the City until after the fact, on February 18, 2011. (Doc.

109 at 106; Doc. 110 at 75). Mr. Johnson testified that he met with counsel shortly after the initial seizure and that his attorney contacted Lieutenant Boone of the Blue Ash Department to discuss the return of the seized property. (Doc. 109 at 90-91). The Johnsons went to the Blue Ash Police Department with counsel within one week of the seizure to determine how they could obtain the property. (*Id*. at 126-127). Mrs. Johnson testified that she made telephone calls to Blue Ash Detectives Gerhardt and Schlie in January 2011 requesting the return of the seized items. (Doc. 110 at 66-67). She testified that she asked when the items would be returned and was told "not yet" and "they would let me know." (Doc. 110 at 68). Blue Ash subsequently returned to Right-Now "paperwork" needed for the business, cash, and other items seized during the search. (Doc. 109 at 91-94, 106).

Mr. Johnson testified that he made numerous attempts to retrieve Right-Now's property from the City in December 2010 and January 2011. Mr. Johnson testified that he contacted Blue Ash Lieutenant Boone, Detective Schlie and Detective Gerhardt asking when his property would be returned and what steps he needed to take to get it. He testified that he spoke with Detective Gerhardt for at least two to three weeks about getting Right-Now's property back. Detective Gerhardt disavowed any knowledge of the status of the property and kept telling Mr. Johnson to "call back" later or to contact the federal prosecutor. Mr. Johnson also spoke with Detective Schlie, who stated he did not know when Mr. Johnson would get his property back and that it might depend on what the FBI decided. Mr. Johnson testified that he telephoned Lieutenant Boone and left him a voice mail message that he wanted the property returned and asked what he needed to do to achieve that. In early February 2011, Mr. Johnson was able to schedule a meeting for February 18, 2011 with Lieutenant Boone so that Lieutenant Boone could explain how Right-Now could retrieve its property. At the February 18, 2011 meeting, however, Mr.

17

Johnson learned for the first time that the trucks had already been released to Ford the previous day. *See* Doc. 109 at 90-94, 106-07, 126-28.

Right-Now also presents evidence that the City affirmatively instructed Ford to refrain from speaking to Right-Now regarding the trucks, which further inhibited Right-Now's ability to regain possession of the trucks. (Doc. 94 at 10, Doc. 122 at 10-13). *See* Doc. 106 at 17-18 (Ford representative Barbara Burton testified that Detective Kelley asked Ford to not let Right-Now know about the City's investigation). *See also* Doc. 106, Ex. 29 at 7 (a December 15, 2010 call log of Ford's communications with the City reflects that Detective Kelley directed Ford to not speak to Right-Now about its accounts; December 21 and 31, 2010 log entries reiterate Detective Kelly's instruction and further explain that discussing the matter with Right-Now could jeopardize the City's investigation; a December 16, 2010 entry provides that Detective Kelley called Ford and told it that the City would not be returning the vehicles to Right-Now ).[9]

The City argues it did not violate Right-Now's due process rights because Right-Now had actual notice that the City seized the trucks for forfeiture and did not plan on returning them. The City presents the affidavit of Lieutenant Boone which states that on December 14, 2010, as the search warrant was being executed, he verbally informed Right-Now's President Dennis Johnson "that the City intended to pursue a forfeiture action with respect to the property seized from Right-Now . . . including the two Ford Trucks." (Doc. 116, Ex. B, ¶ 4). The City also cites to Mr. Johnson's testimony that he was told by a City officer that Right-Now's property would "never" be returned "if [the officer] ha[d] anything to do with it . . ." (Doc. 109 at 88-89). Captain Riley of the Blue Ash Police Department testified that Right-Now was notified orally that the City intended to initiate forfeiture proceedings on the trucks following their seizure.

---

[9]Detective Kelley testified he did not "recall" making such comments to Ford, but he did not deny that he made these statements. (Doc. 103 at 29-30).

18

(Doc. 111 at 49-51). Captain Riley testified that this oral notice was intended to convey to Right-Now that property had in fact been taken, and that the City intended to forfeit and not return the property. (Doc. 111 at 58). Detective Kelley also testified that Right-Now was notified that a forfeiture action was going to be initiated in relation to the trucks. (Doc. 103 at 51). Finally, the record includes a copy of a forfeiture application indicating that Detective Kelley personally notified Right-Now on December 14, 2010, of the City's intent to forfeit the trucks. (Doc. 112, Ex. 29). City contends that these facts establish that Right-Now had actual knowledge that the City's intent was to keep the trucks after they had been seized and, therefore, Right-Now had sufficient notice under the Due Process Clause. (Doc. 116 at 16-17, citing *State of Ohio v. Mateo*, 565 N.E.2d 590 (Ohio 1991); *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 233 (Tex. 2011); *City of West Covina v. Perkins*, 525 U.S. 234 (1999)).

There is no dispute that the City did not notify Right-Now that it was releasing the trucks to Ford prior to Ford's taking possession of the trucks on February 18, 2011. It is also undisputed that the City never initiated forfeiture proceedings in court.[10] The City contends, however, that its notice to the Johnsons that the City intended to institute forfeiture proceedings was adequate notice for due process purposes because Right-Now had actual notice that the trucks had been seized and the City did not intend to return them. The City also contends that once Right-Now had notice the trucks had been seized, Right-Now was free to avail itself of the remedy set forth in Ohio Rev. Code § 2981.03(A)(4) to seek the return of the trucks, which the City asserts provides "adequate process" to regain possession of the trucks and Right-Now simply chose not to avail itself of this opportunity.

---

[10]When asked why forfeiture proceedings were not initiated in court, Lt. Boone testified that "[t]he federal prosecutor told us to give everything back." (Doc. 112 at 25).

### a. Due Process Requirements under *City of West Covina*

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Id.* (citations omitted). "A primary purpose of the notice required by the Due Process Clause is to ensure that the opportunity for a hearing is meaningful." *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999) (citing *Mullane*, 339 U.S. at 314).

"[D]ue process is flexible and calls for procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In determining what process is due, the Court should weigh the governmental and private interests involved:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In *City of West Covina*, cited by the City in support of its argument, the Supreme Court addressed the issue of whether due process "requires a State or its local entities to give detailed and specific instructions or advice to owners who seek return of property lawfully seized but no longer needed for police investigation or criminal prosecution." 525 U.S. at 236. That case involved the seizure of several items of the plaintiffs' personal property by City of West Covina

law enforcement officials pursuant to a valid search warrant and in connection with a criminal

investigation of an unrelated individual who had previously been a boarder at the plaintiffs'

home. *Id.* Following execution of the search warrant, the officers left a copy of a "Search

Warrant: Notice of Service" and an itemized list of the property seized. *Id.* at 236-37. The

plaintiffs attempted to recover the items by contacting the police department and the judge who

issued the warrant, but were unsuccessful. *Id.* at 237. The plaintiffs then filed suit against the

City of West Covina, arguing that the City failed to provide them with notice of the state

procedures for the return of seized property and the information to gain access to such

procedures. *Id.* at 237-38. The District Court granted summary judgment for the City, but the

Ninth Circuit reversed. The Court of Appeals determined that due process required the plaintiffs

be provided, in addition to the information set forth in the City's search warrant/inventory form,

detailed notice of the state procedures for return of seized property and the information necessary

to invoke those procedures, including the search warrant number and a method for obtaining it.

The Supreme Court disagreed, holding that "[w]hen the police seize property for a criminal

investigation, . . . due process does not require them to provide the owner with notice of state-

law remedies." *Id.* at 240. The Court determined that when property is seized pursuant to a

valid warrant, due process requires individualized notice to the property owner that the property

has been taken "so the owner can pursue available remedies for its return." *Id.* Without such

individualized notice, "the property owner would have no other reasonable means of ascertaining

who was responsible for his loss." *Id.* at 241. The Supreme Court stated this same rationale

does not apply to notice of state law remedies that are "established by published, generally

available state statutes and case law." *Id.* "Once the property owner is informed that his

property has been seized, he can turn to these public sources to learn about the remedial

21

procedures available to him. The City need not take other steps to inform him of his options."

*Id.* at 241. The Supreme Court concluded that the published, generally available California state statutes provided the plaintiffs with adequate notice of their post-deprivation remedies for purposes of due process. *Id.*

Here, it is undisputed that Right-Now had actual notice of the seizure of its trucks following the execution of the search warrants. Right-Now does not dispute that the trucks were legally seized pursuant to a valid search warrant or that it received copies of the seizure warrants listing the trucks and other items seized by Blue Ash police. Similar to the California statute in *City of West Covina*, Ohio has a statutory remedy for contesting an allegedly unlawful seizure. Ohio Rev. Code § 2981.03 provides in relevant part:

> A person aggrieved by an alleged unlawful seizure of property may seek relief from the seizure by filing a motion in the appropriate court that shows the person's interest in the property, states why the seizure was unlawful, and requests the property's return. If the motion is filed before an indictment, information, or a complaint seeking forfeiture of the property is filed, the court shall promptly schedule a hearing on the motion, and at the hearing the person shall demonstrate by a preponderance of the evidence that the seizure was unlawful and that the person is entitled to the property. . . .

R.C. § 2981.03(A)(4). The City argues that under *City of West Covina*, the only notice that it was required to provide was individualized notice of the initial seizure; Right-Now was then free to avail itself of the remedies available under Section 2981.03, but the City had no duty to advise Right-Now of those state remedies.

The undersigned agrees that due process did not require the City to provide Right-Now with specific notice of the remedies available to it under the Ohio statute when the City initially seized the trucks. *City of West Covina*, 525 U.S. at 240. This case, however, is distinguishable from *City of West Covina* in two material respects. First, the only party claiming an interest in the property in *City of West Covina* was the sole owner of the seized property. In contrast, this

case involves two parties claiming an interest in the seized property: Right-Now – the owner of

the trucks – and Ford – the lienholder on the trucks.  Second, this case involves two discrete

points in time during which Right-Now was arguably entitled to notice by the City: (1) at the

time of the initial seizure of the property pursuant to the warrant; and (2) at the time prior to the

City's release of the trucks to Ford.  Right-Now does not complain that the City was required to

inform it of its Ohio statutory remedies to contest the seizure like the notice challenged in *City of*

*West Covina*.  Rather, Right-Now asserts the City was required to provide it notice prior to

releasing the trucks to a third-party lienholder in the absence of forfeiture proceedings.

Therefore, Right-Now's due process claim raises an issue not addressed by *City of West Covina*

– what, if any, notice must a municipality provide when two entities assert a property interest in

lawfully seized items and the municipality, unilaterally and in the absence of court proceedings,

determines which entity has the greater property interest.  Given these distinctions, the

undersigned finds that *City of West Covina* is not dispositive of Right-Now's due process claim.

It also bears noting that the Supreme Court's holding in *City of West Covina* was

premised in part on the fact that the remedies available to the plaintiffs were "established by

published, generally available state statutes and case law."  *City of West Covina*, 525 U.S. at 241.

Though the Ohio forfeiture statute is published and generally available, the Blue Ash Police

Department policy providing that seized property may be returned by the City to a lienholder,

and not the original owner, is not.  Right-Now therefore cannot be held responsible for knowing

that the trucks would potentially be released to a lienholder as a matter of City policy in the event

that forfeiture was not pursued by the City.  *See Memphis Light, Gas and Water Div. v. Craft*,

436 U.S. 1 (1978) (notice of remedies and procedures required where utility's internal

administrative procedures were not publicly available to notify utility customer of process for

contesting billing disputes). *See also Gates v. City of Chicago*, 623 F.3d 389, 399 (7th Cir. 2010) (distinguishing *City of West Covina* and finding that the defendant municipality was required to advise arrestees of procedure to retrieve property where the procedure was contained in unpublished city policies not generally available to the public).

For the above reasons, the Court finds that *City of West Covina* is not dispositive of Right-Now's due process claims.[11]

### b. The City's Due Process Obligations

In this case, the question of the adequacy of notice under the Due Process Clause relates not to the moment the trucks were initially seized from Right-Now, but to the moment the trucks were transferred from the custody of the City to the custody of a third-party lienholder after the City determined that it would not be pursuing forfeiture proceedings. The fact that Right-Now may have had a remedy for seeking return of the trucks from the City pursuant to Ohio Rev. Code § 2981.03 upon the initial seizure of the trucks does not obviate the City's independent obligation to provide to Right-Now notice, reasonably calculated under all the circumstances, of the City's unilateral decision to release the trucks to a third-party lienholder – and not to Right-

---

[11]The City also cites to *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 238-39 (Tex. 2011), where the Texas Supreme Court relied on *City of West Covina* and determined that law enforcement authorities were not required to provide notice of post-seizure remedies and that notice of the initial property deprivation sufficed for due process purposes. *See* Doc. 116 at 17-18. For the reasons stated *supra*, *City of Dallas* is distinguishable because the constitutional deprivation alleged by Right-Now relates to the City's failure to provide notice of the release of the trucks to Ford, not to whether the City was required to provide notice of Right-Now's post-seizure remedies at the time of the initial seizure. The City's reliance on *State v. Mateo*, 565 N.E.2d 590 (Ohio 1991), *see* Doc. 116 at 16, is similarly misplaced. In *Mateo*, the Supreme Court of Ohio reversed the appellate court's decision to vacate the forfeiture of a motor vehicle, finding that due process did not require notice and a hearing where the owner of the vehicle had actual knowledge of the state's forfeiture proceeding at the time the owner, a criminal defendant, entered his guilty plea in open court. *Mateo*, 565 N.E.2d at 592-94. *Mateo* is distinguishable because the record in that matter clearly reflects that the judge overseeing the entry of the vehicle owner's guilty plea ensured that the owner was aware of the forfeiture and of his rights to challenge those proceedings. *Id.* As there is no evidence in the record establishing that Right-Now was advised of formal forfeiture proceedings and it is undisputed that the City provided no notice to Right-Now regarding the release of the trucks to Ford, the rationale supporting *Mateo* does not apply here.

Now – to afford Right-Now a meaningful opportunity to assert its rights and contest the action. *Mullane*, 339 U.S. at 314.

Nor was the City's oral notification to Right-Now that it intended to forfeit the trucks and did not plan on returning them sufficient to put Right-Now on notice that the City would turn the trucks over to a third-party. Even assuming Right-Now was informed on the date the trucks were seized that "the City intended to pursue a forfeiture action," this notice implied that the City would be pursuing either criminal or civil forfeiture under Ohio Rev. Code § 2981.03. The statutory forfeiture process contemplates the giving of an additional notice, aside from notice of the initial seizure, and the institution of judicial proceedings before a final determination will be made on the disposition of seized property. In the event the City determined to forfeit the property, Right-Now would be given separate notice that the trucks were subject to forfeiture and the opportunity to be heard in a judicial proceeding. *See State v. Recinos*, 2014 WL 3339624, at *3-4 (Ohio Ct. App. July 7, 2014) (and cases cited therein).[12] Thus, when Right-Now was

---

[12] The Court of Appeals in *Recinos* set forth the forfeiture process under Ohio law:

R.C. Chapter 2981 permits "[a] law enforcement officer [to] seize property that the officer has probable cause to believe is property subject to forfeiture." R.C. 2981.03(A)(2). "Property subject to forfeiture" is defined to include "contraband" and "instrumentalities" involved in the commission of a felony. See R.C. 2981.01(B)(13) and R.C. 2981.02(A)(1), R.C. 2981.02(A)(3)(a), and R.C. 2981.02(B).

{¶ 21} A prosecuting attorney may then pursue forfeiture of seized property in a criminal proceeding under R.C. 2981.04, a civil proceeding under R.C. 2981.05, or both. R.C. 2981.03(F). Criminal forfeiture is initiated by including in the charging instrument a specification consistent with R.C. 2941.1417 or by providing the defendant with "prompt notice," in conformity with Crim. R. 7(E), that the property is subject to forfeiture. R.C. 2981.04(A)(1) and (A)(2). Civil forfeiture is initiated by filing "a complaint requesting an order that forfeits the property to the state or a political subdivision." R.C. 2981.05(A). See, *State v. North,* 1st Dist. Hamilton No. C–120248, 2012–Ohio–5200, ¶ 8.

{¶ 22} Forfeiture may be ordered *only after the prosecuting attorney has identified and notified parties with an interest in the property*, the trial court has conducted a hearing, and the trier of fact has found that the property is subject to forfeiture. *See* R.C. 2981.04(A) and (B), R.C. 2981.05(B) and (D), and R.C. 2981.03(A)(1). *State v. North,* ¶ 9; *Accord, State v. Allen,* 10th Dist. Franklin Nos. 13AP–460, 13AP–462, 2014–Ohio–1806, ¶ 28.

notified that the City intended to institute forfeiture proceedings on the trucks, it could

reasonable expect that it would have the opportunity to contest any legitimate claim of

entitlement to the trucks within the context of a court forfeiture proceeding.  Although Detective

Kelley began processing the paperwork for forfeiture proceedings, it is undisputed that those

proceedings were never instituted in court.

      The issue then is whether the oral notice of intent to forfeit the trucks given by the City to

Right-Now was sufficient under the Due Process Clause where forfeiture proceedings were never

instituted nor completed, and the property was returned not to Right-Now, but released to a third-

party lienholder.  The undersigned finds it is not sufficient because to hold otherwise would

permit the state to provide less due process when it unilaterally decides between parties with

competing property interests who should receive the property, than the process due to a criminal

defendant in a statutory forfeiture proceeding where a court determines the proper disposition of

the property.  Before the state can forfeit property seized pursuant to a search warrant, the state

must follow specified procedures, including notice to all the parties with an interest in the

property and a hearing.  Whether the property owner files a pre-indictment motion contesting the

seizure under Ohio Rev. Code § 2981.03 does not obviate the state's duties of providing notice

and a hearing under the forfeiture laws.  It would be incongruous to afford less protection when

the government ultimately decides not to forfeit the property.  It is undisputed that Right-Now

was never notified by the City that the trucks were being released to Ford prior to the transfer of

the vehicles.  Once the City determined it was not going to initiate forfeiture proceedings and

was going to release the property to a third-party lienholder, it was incumbent upon the City in

---

*Recinos*, 2014 WL 3339624, at *3-4 (emphasis added).  The forfeiture statute also provides that if property is seized pursuant to this statute and no criminal forfeiture action is commenced, the prosecutor must commence civil forfeiture proceedings within 30 days of the seizure.  *See* Ohio Rev. Code § 2981.03(F).

deciding what to do with the trucks to give notice to all those with an interest in the trucks before they left the City's possession. Notifying Right-Now that forfeiture proceedings were "intended" in no way provided Right-Now with meaningful notice that the City was going to give the trucks to a lienholder – Ford – without instituting forfeiture proceedings. Because Right-Now had a property interest in the trucks, it was entitled to notice reasonably calculated under the circumstances to inform it how to regain possession of the trucks. The notice of an intended forfeiture, that in fact is never instituted, does not constitute adequate notice under the circumstances.[13]

The City's notice of the seizure and verbal notice of "intent" to forfeit the trucks was not sufficient to put Right-Now on notice that (1) the City was going to release the trucks to a third-party lienholder once the decision not to forfeit was made; and (2) the City would unilaterally make the decision who was entitled to possession of the trucks between Right-Now and Ford. Once the City decided it would not forfeit the trucks, it should have either returned the trucks to Right-Now and let Right-Now and Ford resolve any contractual issues between themselves or provided Right-Now with prior notice that it was going to release the trucks to Ford to enable

---

[13]The course of dealings between Right-Now and the Blue Ash Police Department regarding the return of the seized property further supports a finding that Right-Now was not put on notice that the City intended to not return the trucks. *See* Doc. 110 at 66-68 (Mrs. Johnson testified that when she spoke with Detective Gerhardt during the initial seizure, he told her she would get the seized money back within a day or two and "not to worry about" getting a receipt for the money because he would get it back to her); *id.* at 72-73 (further testifying that a Blue Ash police officer returned her checkbooks after contacting her and informing her that she could pick them up); *id.* at 68 (Mrs. Johnson stated that she spoke with Blue Ash Police Detectives Gerhardt and Schlie in January 2011 and asked about getting the other seized property back and was told, "Not yet. They would let [her] know."). Further, review of the call logs documenting the City's dealings with Ford reveals that the City actively took steps to prevent Right-Now from learning of its intent to release the trucks to Ford, the third-party lienholder. *See* Doc. 106 at 17-18; Doc. 106, Ex. 29 at 7 (the call logs include notations that Detective Kelley directed Ford to not speak to Right-Now about the interactions between Ford and the City regarding Ford's property interest in the trucks).

Right-Now to assert its own property interest in the trucks. As it is undisputed that the City did neither, Right-Now is entitled to summary judgment on its due process claim against the City.[14]

## B. Right-Now's Breach of Contract and Unjust Enrichment Claims against Ford

Right-Now alleges that Ford breached the terms of the Installment Contracts by taking possession of the trucks from the City and refusing to return them to Right-Now despite the fact that Right-Now continued to perform under the contracts by making monthly payments. (Doc. 36, ¶ 54). Right-Now further alleges that Ford was unjustly enriched because it continued to accept the monthly payments while Right-Now was deprived of the use of the trucks. (*Id.*, ¶ 56). Ford moves for summary judgment on both claims, asserting that: (1) Right-Now cannot establish its breach of contract claim, and (2) the unjust enrichment claim is precluded under Ohio law. (Doc. 120 at 8-12). For the following reasons, the undersigned finds that Ford is entitled to summary judgment on Right-Now's breach of contract and unjust enrichment claims.

1. *Breach of Contract*

On June 26, 2009, the parties entered into an Ohio Simple Interest Vehicle Installment Retail Agreement whereby Right-Now was to make installment payments to Ford for the purchase of a 2009 Ford F550 truck. (Doc. 106, Ex. 15-16, Copies of the Installment Contracts). The parties entered into an identical agreement on January 28, 2010, regarding the purchase of a 2010 Ford F250 truck. (*Id.*). The pertinent provisions of the Installment Contracts are as follows:

> I. Default: You will be in default if . . . [y]our vehicle is seized by any local, state, or federal authority and is not promptly and unconditionally returned to you. . . . If you default, Creditor [Ford] can invoke Creditor's rights under this contract and Creditor's other rights under the law. . . .

―――――――――――――――

[14]In its response to the City's motion for summary judgment, Right-Now concedes that its claim for punitive damages is improper. *See* Doc. 126 at 2. Accordingly, the City is entitled to summary judgment on Right-Now's claim for punitive damages.

J. Repossession: If you default, [Ford] may require you to pay at once the unpaid Amount Financed, the earned and unpaid part of the Finance Charge and all other amounts due under this contract. [Ford] may repossess (take back) the vehicle too. . . .

K. Your Right to Redeem: If the vehicle is taken back, [Ford] will send you a notice. The notice will say that you may redeem (buy back) the vehicle and will explain how to redeem the vehicle. You may redeem the vehicle up to the time [Ford] sells it or agrees to sell it. If you do not redeem the vehicle, it will be sold. . . .

L. Disposition of Motor Vehicle: If the vehicle is taken back and sold, the money from the sale, less allowed expenses, will be used to pay the amount still owed on the contract. Allowed expenses include those paid as a direct result of having to retake the vehicle, hold it, prepare it for sale, and sell it. If there is any money left [a surplus], it will be paid to you. If the money from the sale is not enough to pay off this contract and costs, you will pay what is still owed to [Ford].

(*Id.*).

Ford argues that it is entitled to summary judgment on plaintiff's breach of contract claim because Right-Now did not comply with its contractual obligations and Ford's actions were permitted under the terms of the Installment Contracts. Ford asserts Right-Now was in default of the Installment Contracts at the time Ford took possession of the trucks because the City seized the trucks and did not "promptly and unconditionally" return them to Right-Now. Ford further asserts that by taking possession, it was simply exercising its rights under the Installment Contracts to repossess the vehicles given Right-Now's default. Ford also maintains that it never refused to return the trucks to Right-Now as alleged in the amended complaint, but merely required Right-Now to cure the default by providing an unconditional release from the City for the trucks as a condition of returning them. Ford thus asserts that it is entitled to summary judgment on plaintiff's breach of contract claim. (Doc. 120 at 7-9).

In its response in opposition, Right-Now does not specifically dispute Ford's assertion that it defaulted under the Installment Contracts.[15] Rather, it argues that by accepting Right-Now's monthly Installment Contract payments, Ford waived its right to assert its default claims. Right-Now maintains that Ford's acceptance of these payments effectively conveyed the message to Right-Now that it was performing its contractual obligations and was not in default, and that such conduct constitutes a waiver of Ford's right to assert default under Ohio law. Right-Now also claims that Ford's actions – accepting payments from Right-Now while maintaining possession of the trucks – is a breach of the Installment Contracts and contrary to public policy as enunciated in *Frank Nero Auto Lease, Inc. v. Townsend*, 411 N.E.2d 507 (Ohio Ct. App. 1979). Right-Now therefore contends that summary judgment in favor of Ford is improper. (Doc. 125 at 5-9).

In reply, Ford notes that Right-Now has failed to dispute that it defaulted under the Installment Contracts' terms. Regarding waiver, Ford asserts that Right-Now has failed to establish that Ford waived its rights under the Installment Contracts as required under Ohio state law. Ford also cites to the specific provisions of the Installment Contracts which govern its rights in the event of a default to refute Right-Now's argument that ongoing acceptance of monthly payments by Ford constitutes a breach of the agreements. Ford maintains that it is entitled to summary judgment on the breach of contract claim because the undisputed facts and the terms of the contracts establish that Right-Now defaulted while Ford acted in conformance with its contractual obligations. (Doc. 131 at 2-10).

To establish a breach of contract claim under Ohio law, Right-Now must prove, by a

---

[15]However, in responding to Ford's proposed undisputed facts, Right-Now subsequently indicated that it disputes the default determination. *See* Doc. 138, ¶ 9.

preponderance of the evidence: (1) the existence of a contract; (2) performance by Right-Now;

(3) breach by Ford; and (4) damages or loss to Right-Now. *Savedoff v. Access Group, Inc.*, 524

F.3d 754, 762 (6th Cir. 2008) (citing *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio Ct. App.

2007)). "A party breaches a contract if [it] fails to perform according to the terms of the contract

or acts in a manner that is contrary to its provisions." *Id*. at 762. The trial court is responsible

for interpreting the terms of a written contract and in doing so must look to the intent of the

parties. *Id*. at 763 (citing *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)

(applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991)

(applying Ohio law); *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 566

(Ohio 2007)). "The intent of the parties is presumed to reside in the language they choose to use

in their agreement." *Id*. (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio

1996)). Where a contract's terms are clear and unambiguous, the Court must ascertain the

parties' intent from the plain language of the contract. *Id*. (citing *St. Marys*, 875 N.E.2d at 566).

Extrinsic evidence is admissible only where the terms are unclear or ambiguous. *Id*. (citing

*Graham*, 667 N.E.2d at 952).

It is undisputed that the Installment Contracts between Right-Now and Ford are valid

contracts. The Court's inquiry is therefore limited to whether Right-Now performed under the

contracts and whether Ford breached them. As neither party asserts that the terms of the

Installment Contracts are ambiguous, the Court may look no further than the four corners of the

contracts to determine the parties' intent. *Savedoff*, 524 F.3d at 763.

The plain language of the Installment Contracts provides that the failure to obtain an

unconditional release of the truck from a seizing authority constitutes default:

> I. Default:  You will be in default if . . . [y]our vehicle is seized by any local,
> state, or federal authority and is not promptly and unconditionally returned to you.

31

> . . . If you default, Creditor [Ford] can invoke Creditor's rights under this contract
> and Creditor's other rights under the law. . . .

Doc. 106, Ex. 15, § I.

The undisputed facts establish that Right-Now's trucks were seized by the Blue

Ash Police Department on December 14, 2010, and they were not unconditionally

returned to Right-Now. Instead, the trucks were released to Ford on February 17, 2011,

upon Ford's execution of seized Property Releases. *See* Doc. 120, Ex. A, ¶¶ 6, 8-9,

Affidavit of Barbara Burton (attesting that as a condition of releasing the trucks to Ford,

the Blue Ash Police Department required Ford to execute a stipulated release); Doc. 106,

Exhs. 4, 5, Seized Property Releases. *See also* Doc. 103 at 88 (Blue Ash Police

Department Detective Kelley testified that as a condition of releasing the trucks, Ford

was required to execute the Seized Property Releases). The Seized Property Releases

were executed by Ford on February 16, 2011, and include a provision notifying Ford that

it could lose its status as an innocent owner if it returned the trucks to Dennis Johnson,

the owner of Right-Now. (Doc. 106, Exhs. 4, 5). Because the trucks were not

unconditionally returned to Right-Now, but instead were released by the Blue Ash Police

Department to Ford, Right-Now was in default of the Installment Contracts. Right-Now

failed to perform its contractual obligations by defaulting under the plain terms of the

Installment Contracts. Therefore, Right-Now cannot establish its breach of contract

claim as a matter of law. *See Mays v. Hartman*, 77 N.E.2d 93, 97 (Ohio Ct. App. 1947)

(citing *Mehurin v. Stone*, 37 Ohio St. 49, 55 (Ohio 1881) ("The party in default [cannot]

recover . . . on the contract. . . .")). Summary judgment in favor of Ford is therefore

appropriate.

Right-Now's argument that Ford waived its right to assert Right-Now's default as a defense to the breach of contract claim is unpersuasive. "Under Ohio law, a party may waive [and voluntarily relinquish its right to enforce] contractual terms by intentionally acting in a manner inconsistent with the claimed right and thereby be estopped from insisting upon it." *MoonScoop SAS v. American Greetings Corp.*, 489 F. App'x 95, 106 (6th Cir. 2012) (citing *Marfield v. Cincinnati, D. & T. Traction Co.*, 144 N.E. 689, 691 (Ohio 1924)). The party asserting waiver must put forth evidence establishing a clear, unequivocal, and decisive act demonstrating the intent to waive. *N. Olmsted v. Eliza Jennings, Inc.*, 631 N.E.2d 1130, 1134-35 (Ohio Ct. App. 1993) (citing *White Co. v. Canton Transp. Co.*, 2 N.E.2d 501, 504-05 (Ohio 1936)). The party having the duty to perform may enforce the waiver if it changed its position as a result of the waiver. *Chubb v. Ohio Bur. of Workers' Comp.*, 690 N.E.2d 1267, 1269-70 (Ohio 1998).

Right-Now argues Ford waived its right to assert default because it continued to accept Right-Now's monthly installment payments on the trucks. This argument is not well-taken because it is inconsistent with the terms of the Installment Contracts, Ohio waiver law, and the undisputed evidence of record. First, the plain language of the Installment Contracts contradicts Right-Now's assertion. Under the terms of the Installment Contracts, in the event of default by Right-Now, Ford was permitted to invoke its contractual rights to, *inter alia*, repossess the trucks and require Right-Now to pay the remainder of the amounts owed. *See* Doc. 106, Ex. 15, § J. In making its waiver argument, Right-Now does not address these contractual terms or explain how Ford's act of accepting monthly payments despite Right-Now's default, which is consistent with Ford's rights under the Installment Contracts, is a clear and decisive act showing Ford's intent to waive its rights under the agreements. Ford repeatedly advised Right-Now that it considered

Right-Now to be in default under the Installment Contracts because the City did not unconditionally return the seized trucks (Doc. 131, Ex. A, Ex. B) and Right-Now has pointed to no other evidence showing that Ford acted inconsistently with this view.  The mere acceptance of monthly payments by Ford does not establish an unequivocal waiver by Ford under the plain language of the Installment Contracts and Ford's conduct in conformity thereto.  Right-Now has not established that Ford waived its rights under the agreements.

Second, Right-Now's interpretation of Ford's conduct is inconsistent with the law on waiver.  "The acceptance of installment payments constitutes neither actual intent to relinquish the right to full payment nor an adequate substitute therefore." *Bank One of E. Ohio, N.A. v. Liberty Bell, Inc.*, No. 88-T-4142, 1990 WL 2547, at *3 (Ohio Ct. App. Jan. 12, 1990).  The facts of *Bank One* are similar to the instant case: the contract in that case provided that in the event of a default by the defendants, the plaintiff had the right to collect full payment. *Id*.  After the defendants defaulted, the *Bank One* plaintiff filed a breach of contract suit and the defendants argued that the plaintiff waived its right to enforce the contract because it continued to accept monthly payments from the defendants despite the default. *Id*., at *1-3.  The Ohio Court of Appeals rejected this waiver argument because under the terms of the controlling contract, the plaintiff was entitled to collect full payment in the event of default and it "could hardly be reasonably expected to reject installment payments. . . ." *Id*., at *3.  It would likewise be unreasonable to expect Ford to reject installment payments from Right-Now as Ford was entitled to the payments whether or not Right-Now was in default. *See also K.B. Oil Co. v. Ford Motor Credit Co., Inc.*, 811 F.2d 310, 313 (6th Cir. 1987) (where plaintiff defaulted on installment contract by making late payments, defendant did not waive its contractual rights to repossess vehicle by continuing to accept payments where the contract permitted repossession and plaintiff

34

did not cite to any other action that could be viewed as a waiver); *Metro Life Ins. Co. v. Triskett Illinois, Inc.*, 646 N.E.2d 529, 532 (Ohio Ct. App. 1994) (holding that acceptance of installment payment from defaulting party did not, standing alone, support a finding of waiver).

Right-Now relies on *Frank Nero Auto Lease, Inc. v. Townsend*, 411 N.E.2d 507 (Ohio Ct. App. 1979) to support its assertion that Ford is estopped from asserting Right-Now's default as a defense.[16] In *Townsend*, the Ohio Court of Appeals held that a default provision in an installment contract permitting the lessor to repossess the vehicle was invalid and unenforceable as contrary to Ohio's public policy. *Id*. at 511. The contract permitted the lessor to repossess the leased vehicle, relet or resell it, and collect payments for the entire lease period and there was no provision requiring the lessor to mitigate damages. The Court invalidated the repossession provision because it enabled "the lessor to receive a double payment for the leased motor vehicle and [bore] no reasonable relationship to damages actually sustained." *Id*. In contrast, the Installment Contracts in the instant case contain a mitigation provision which precludes Ford from obtaining double payment. *See* Doc. 106, Ex. 15, § L (providing that, in the event of repossession and sale of the trucks, Ford is entitled to only the amount owed by Right-Now on the contract and specified allowed expenses; all money left over from the sale of the trucks is to be returned to Right-Now). Because the Installment Contracts recognize Ford's obligation to mitigate damages, they are distinguishable from the *Townsend* contracts and are valid and enforceable. *See Ind. Leasing Corp. v. Garbage Trash Svs., Inc.*, No. 85AP-943, 1986 WL 7163, at *3 (Ohio Ct. App. June 26, 1986) (citing *Master Lease of Ohio, Inc. v. Andrews*, 485 N.E.2d 820, 823 (Ohio Ct. App. 1984) ("Unlike the *Townsend* lease, the parties' agreement here does not authorize lessor to impose a penalty or obtain double recovery for its loss. This lessor cannot

---

[16]The undersigned notes that while Right-Now cites to *Townsend* in connection with its waiver argument, *see* Doc. 125 at 7, that case addresses whether a contract provision permitting the acceleration of lease payments without the duty to mitigate damages was enforceable due to public policy considerations, not waiver.

recover the accelerated rental payments and sell the repossessed equipment without crediting lessees with the net proceeds of that sale.")).[17]

In sum, the undisputed facts establish that Right-Now was in default of the Installment Contracts because the trucks were seized by the Blue Ash Police Department and not unconditionally returned. Under the plain language of the contracts, Ford was therefore entitled to take possession of the trucks and seek the remainder owed on the Installment Contracts from Right-Now. Ford's continued acceptance of installment payments was not a waiver of these rights in light of the plain language of the contracts, and the inclusion of a mitigation provision forecloses Right-Now's assertion that Ford is estopped from enforcing its contractual rights. The Court finds that Ford is entitled to summary judgment on Right-Now's breach of contract claim.

2. *Unjust Enrichment*

Ford also moves for summary judgment on plaintiff's unjust enrichment claim. Ford maintains that as a quasi-contractual remedy, Right-Now's unjust enrichment claim is precluded given the existence of the Installment Contracts – valid and enforceable written contracts between Ford and Right-Now. Ford also argues that to the extent Right-Now seeks damages related to the running of the warranties on the trucks during the time they were in Ford's possession, the warranties were not issued by Ford and therefore Right-Now cannot establish that Ford reaped any financial benefit therefrom. (Doc. 120 at 10-12).

---

[17]Right-Now's reliance on *Slusser v. Wyrick*, 502 N.E.2d 259 (Ohio Ct. App. 1986) is equally unavailing. *Slusser* involved a claim that the defendant waived its contractual right to repossess an automobile where it consistently accepted late installment payments from the plaintiffs. The Court found for the plaintiffs because the defendant's acts "had the effect of conveying to the plaintiffs that they were in conformance with their contract and this lulled them into a sense of security." *Id*. at 260. Here, Right-Now has put forth no evidence establishing that it was lulled into a sense of security and the unrefuted evidence of record establishes that Right-Now was notified by Ford that Ford considered Right-Now to be in default under the Installment Contracts. *See* Doc. 106, Ex. 16 at 7 (on February 24, 2011, then counsel for Right-Now contacted Ford and related that Right-Now disputed Ford's determination that Right-Now was in breach of the Installment Contracts).

Right-Now responds that it may properly pursue an unjust enrichment claim as an alternative to its breach of contract claim in the event the Court finds that Ford's repossession of the trucks terminated Right-Now's obligation to make installment payments for February through April 2011 – the period Ford was in possession of the trucks. Right-Now contends that its ongoing monthly payments conferred an undue benefit on Ford, given Ford's refusal to return the trucks to Right-Now. As such, Right-Now maintains that summary judgment on its unjust enrichment claim is not appropriate. (Doc. 125 at 9-10).

To establish an unjust enrichment claim, Right-Now must prove: (1) that it conferred a benefit on Ford; (2) that Ford was aware of the benefit; and (3) the circumstances make Ford's retention of the benefit unjust. *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984). The theory of unjust enrichment relates to a quasi-contractual obligation and claims for unjust enrichment are intended "not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (internal quotation omitted). "Under Ohio law, a plaintiff may not recover under the theory of unjust enrichment when an express contract covers the same subject." *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp.2d 892, 904 (S.D. Ohio 2013) (citing *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir. 2009)). However, where the existence of a contract is in dispute, unjust enrichment claim may be pled in the alternative to a breach of contract claim. *Id.* (internal citations and quotations omitted). Likewise, a party may recover under a theory of unjust enrichment despite the existence of an express contract covering the same subject where there is evidence of fraud, illegality, or bad faith. *See DavCo Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, No. 2:07-cv-1064, 2008 WL 755283, at *12 (S.D. Ohio Mar. 19, 2008) (citing *Ullmann v. May*, 72 N.E.2d 63 (Ohio 1947)).

37

It is undisputed that the Installment Contracts are valid and enforceable contracts governing the subject matter of the parties' dispute. Further, there is no assertion of fraud, illegality, or bad faith on behalf of either contracting party. Consequently, Right-Now's unjust enrichment claim is precluded under Ohio law.

Right-Now argues that it may proceed with its unjust enrichment claim as an alternative to its breach of contract claim if the Court finds that Ford's repossession of the trucks terminated Right-Now's obligations under the contract. In support, Right-Now cites to *Gevedon v. Gevedon*, 853 N.E.2d 718 (Ohio Ct. App. 2006), where the Ohio appellate court upheld the magistrate and trial court's award of damages on the plaintiff's breach of contract and unjust enrichment claims. Right-Now's reliance on *Gevedon* is misplaced. The *Gevedon* court explicitly noted that "the magistrate and the trial court should not have found in favor of [plaintiff] on both quasi-contract and contract theories. Quasi-contract claims such as unjust enrichment and promissory estoppel apply in the absence of a contract, which was found to exist here." *Id*. at 725, n.3. However, the court did not reverse the damages award because the defendant did not raise the issue on appeal and there was no prejudice to the defendant as "the trial court awarded [the plaintiff] the money only once." *Id*. *Gevedon* therefore reinforces the notion that because unjust enrichment is a quasi-contractual claim, it is precluded where a valid and enforceable contract exists.

Right-Now also cites to *Townsend*, 411 N.E.2d 507, and *Walton Commercial Enters. Inc. v. Ass'ns, Conventions, Tradeshows, Inc.*, 593 N.E.2d 64, 67 (Ohio Ct. App. 1990) to support its argument that its unjust enrichment claim is not precluded because Ford's act of repossessing the trucks terminated Right-Now's obligation to continue to pay on the Installment Contracts. Right-Now's argument is unpersuasive. As stated above, *Townsend* is distinguishable from the

38

instant matter as the installment contract in that case permitted the lessor to repossess the car and accept monthly payments in the absence of a mitigation provision. The Ohio Court of Appeals therefore determined that the contract was unenforceable because it permitted the lessor to reap money that did not bear "a reasonable relationship to the actual damages incurred. . . ." *Townsend*, 411 N.E.2d at 512. As the Installment Contracts in the instant case contain mitigation provisions requiring Ford to pay Right-Now any surplus realized from any post-repossession sale of the trucks, they are valid and enforceable contracts that preclude Right-Now's unjust enrichment claims.

*Walton Commercial Enterprises* is also distinguishable as it involved the failure to return rented goods which had been stolen. The court in *Walton Commercial Enterprises* reiterated *Townsend*'s holding that in the absence of a contractual provision to the contrary, a lessor's repossession of property terminates the lessee's obligation to pay unaccrued rent. *Walton Commercial Enters.*, 593 N.E.2d at 67 (citing *Townsend*, 411 N.E.2d at 511-12)). This common-law bailment principle is inapplicable in the instant matter as Right-Now and Ford's obligations to each other regarding the trucks are governed by valid and enforceable contracts. *See Townsend*, 411 N.E.2d at 512 (common law bailment principles apply only where the contractual provision at issue is unenforceable). Because it is undisputed that the Installment Contracts are valid and enforceable agreements, the common-law bailment principles cited by Right-Now are inapplicable.

Accordingly, Ford is entitled to summary judgment on Right-Now's unjust enrichment claim.

### C. The City's Claims against Ford

The City raises cross-claims of breach of contract, promissory estoppel, and

indemnification and contribution against Ford. The City's claims are based on the Hold

Harmless Agreements executed by Ford prior to the City's release of the trucks to Ford. The

Hold Harmless Agreements provide that Ford "agrees to indemnify and hold you [the City]

harmless for any liability or claim made against you [the City] arising out of your [the City's]

releasing of this vehicle to Automobile Recovery," a third-party repossession entity. (Doc. 106,

Exs. 11, 12; Doc. 120, Ex. A, ¶ 11, Affidavit of Barbara Burton ). The City alleges that Ford

breached the Hold Harmless Agreements by refusing to indemnify the City and defend the City

against Right-Now's due process claim. In asserting its promissory estoppel cross-claim, the

City alleges that Ford knew the Hold Harmless Agreements would induce the City to release the

trucks to Ford; the City was in fact induced to release the trucks to Ford based on the Hold

Harmless Agreements; and as a result of the City's reliance on the Hold Harmless Agreements, it

has been damaged by having to defend against Right-Now's due process claim. The City's final

claim seeks to hold Ford liable for indemnification and contribution pursuant to Ohio common

law and the terms of the Hold Harmless Agreements. (Doc. 75, ¶¶ 1-31, Cross-claims). On May

7, 2014, Ford and the City contemporaneously filed cross-motions for summary judgment on the

City's cross-claims. (Docs. 120, 121).

   Ford asserts that the City's indemnification claims are not ripe at this juncture because

there has been no finding of liability on Right-Now's due process claim against the City. Ford

argues that it is entitled to summary judgment on the City's cross-claims in any event because as

a private actor Ford cannot be held liable for a § 1983 claim based on alleged unconstitutional

conduct. Alternatively, Ford seeks summary judgment on the City's breach of contract claim

because: (1) the Hold Harmless Agreements are not valid and enforceable contracts supported by

bargained-for consideration; (2) Ford's refusal to defend the City against Right-Now's due

40

process claim does not constitute a breach of the agreements; and (3) the City suffered no damages resulting from Ford's purported breach. Ford seeks summary judgment on the City's promissory estoppel claim because: (1) in the event the Court finds the Hold Harmless Agreements are valid contracts, the claim is precluded, and (2) the City cannot establish the requisite elements of a promissory estoppel claim. Lastly, Ford asserts that the City's common law indemnification and contribution claims fail as a matter of law because there has been no legal determination that the City is liable to Right-Now for any damages; there is no express or implied contract between Ford and the City; and the City's own conduct and policy prompted Right-Now's alleged due process violation. (Doc. 120, Ford's summary judgment motion; Doc. 124, Ford's response in opposition to the City's summary judgment motion).[18]

     1. *Whether the City's cross-claims are ripe for adjudication.*

As an initial matter, Ford maintains that the City's cross-claims for indemnification should be dismissed because they are not ripe for adjudication in the absence of a judgment against the City on plaintiff's due process claim. (Doc. 120 at 12). In support, Ford cites to *State Farm Fire and Cas. Co. v. McGowen*, No. 1:03-cv-258, 2004 WL 5572912, at *7 (E.D. Tenn. June 24, 2004), *aff'd on other grounds*, 421 F.3d 433 (6th Cir. 2005), where the court dismissed an indemnification claim because the issue of liability had not been yet been resolved and, therefore, "the duty to indemnify [was] not ripe for adjudication." Here, however, the City claims that Ford not only has a duty to indemnify but also a duty to defend against Right-Now's constitutional claims. (Doc. 75 at ¶ 19). "Where a duty to defend is at issue . . . the entire declaratory action, including the indemnity action, is ripe." *Bil-Jax, Inc. v. SEV Group, Ltd.*, No. 3:05-cv-7107, 2005 WL 2044851, at *2 (N.D. Ohio Aug. 24, 2005) (citing *Maryland Cas. Co. v.*

---

     [18]As the arguments raised by Ford in its summary judgment motion and in response to the City's summary judgment motion are substantially similar, they are summarized together for brevity's sake. Likewise, the arguments raised by the City in its motion and in opposition to Ford's motion are considered together.

*Pacific Coal & Oil Co.*, 312 U.S. 271, 274 (1941)).  Therefore, the City's cross-claims are ripe for adjudication.

> ### 2. *The effect of the Court's November 19, 2012 Order permitting the City to amend its answer and file counter-claims against Ford.*

The City's arguments for summary judgment on its cross-claims are premised largely on the Court's November 19, 2012 Order granting the City's motion to file an amended answer and raise cross-claims against Ford.  In that Order, the undersigned determined that the City's cross-claims were permissible because the plain language of the Hold Harmless Agreements appeared to encompass Right-Now's claims against the City.  *See* Doc. 74 at 5.  The City now contends that under the law-of-the-case doctrine, the Court's ruling is tantamount to a binding legal determination that Ford must indemnify and hold the City harmless for damages related to Right-Now's constitutional claim.

The law-of-the-case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Scott v. Churchill*, 377 F.3d 565, 569-70 (6th Cir. 2004) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).[19]  While the doctrine is "rigidly applied to enforce a lower court's obedience to a higher court, [it is] more flexibly applied to reconsideration of earlier decisions by the same court or a coordinate court." *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 169 F. App'x 976, 985 (6th Cir. 2006).  At the District Court level, the law-of-the-case doctrine is "more appropriately characterized as 'management practice' . . . and prejudgment orders can be reconsidered without restriction." *Id.*

---

[19]While Ohio substantive law controls determination of the City's state law contract claims, the law-of-the-case doctrine is a procedural issue controlled by federal law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). *See also McDonald v. Petree*, 409 F.3d 724, 730 n.2 (6th Cir. 2005) (holding that federal law-of-the-case rules are "procedural").

The City contends the Court has already determined that the Hold Harmless Agreements encompass "any liability [the City] would face resulting from the release of the vehicles to Ford." (Doc. 121 at 6, quoting Doc. 74 at 6). Quoting this language, the City asserts that Ford's liability has already been determined as a matter of law. However, the City's quotation in this regard is incomplete and taken out of context. That particular portion of the Court's Order addresses Ford's retention of the trucks for an additional period of time *after* Ford received notice from the City disclaiming any interest in the trucks. The Order states:

> Blue Ash informed Ford it no longer had an interest in the trucks on April 14, 2011, and Ford did not release the trucks to plaintiff until May 4, 2011. *See* Doc. 36, ¶¶ 35, 38. To the extent that plaintiff seeks money damages from Blue Ash for this three-week period, the plain language of the indemnification agreement encompasses any liability Blue Ash would face resulting from the release of the vehicles to Ford. Consequently, if Blue Ash is at some later date found liable for wrongful seizure of the vehicles, Blue Ash could foreseeably enforce the indemnification agreement against Ford for the time period from April 14 to May 4, 2011.

(Doc. 74 at 6). The City's argument omits this qualifying language limiting the application of the Hold Harmless Agreements to a specific three-week period. Read in full, the phrase quoted by the City does not stand for the proposition that the Court has already determined the indemnification issue as a matter of law.

More importantly, the Court's Order granting the City leave to amend its pleading to assert counter-claims was based on the allegations of the parties' respective pleadings and not on the evidence presented by the parties at the close of discovery and in the context of summary judgment motions. The Court granted the City's motion to amend under the well-recognized principles that leave to amend a pleading under Fed. R. Civ. P. 15 should be liberally granted and freely given "when justice so requires." *Foman v. Davis*, 371 U.S. 178 (1962). In accordance with the liberal policy of permitting amendments to pleadings and the Court's interest in

43

disposing of cases on their merits, the Court granted the City's motion to amend it pleading.

Now, at the summary judgment stage, the City's counter-claims have been fully briefed and

evidence has been submitted by both parties in support of their respective arguments. The law-

of-the case doctrine does not preclude this Court from reconsidering issues preliminarily

addressed at the pleading stage of the proceedings when those issues are now informed by the

parties' evidence and argument. In assessing the instant summary judgment motions, the Court

has reviewed the parties' discovery responses, deposition testimony, and hundreds of pages of

relevant evidence. Further, the issue addressed by the November 2012 Order was limited to

whether the City stated cognizable claims – not whether it *proved* said claims. Given the distinct

considerations of the Court in assessing the motion to amend and the motions for summary

judgment, the City's attempt to invoke the law-of-the-case doctrine is unfounded. *See McKenzie

v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) (a court's holding on a

prior dispositive motion "does not establish the law of the case for purposes of summary

judgment, when the complaint has been supplemented by discovery."). *See also Serran v. Cintas

Corp.*, Nos. 04-40132, 06-12311, 2008 WL 4791677, at *3 (E.D. Mich. Oct. 27, 2008) (finding

that law-of-the-case doctrine did not preclude the court from revisiting issue at summary

judgment that was previously addressed at the pleading stage). The Court now turns to the

parties' substantive arguments on the City's cross-claims.

    3. *The City's breach of contract claim*

It is undisputed that on February 16, 2011, Ford executed two identical Hold Harmless

Agreements which provide:

> Ford Motor Credit is the first secured lien holder on the above-mentioned
> collateral. In this capacity Ford Motor Credit is entitled to possession of the
> vehicle under the contractual agreement made with Right-Now Recycling, Inc. on
> June 26, 2009 [and January 28, 2010].

>Ford Motor Credit agrees to indemnify and hold you harmless for any liability or claim made against you arising out of your releasing of this vehicle to Automobile Recovery.
>
>Anything contained herein to the contrary notwithstanding, the liability of Ford Motor Credit to Blue Ash Police Department hereunder shall be limited in amount to the value of the vehicle released to Ford Motor Credit or its agent.

(Doc. 106, Exs. 11, 12). It is further undisputed that Ford tendered the Hold Harmless Agreements to the City on February 16, 2011, and that the City released the trucks to Ford on February 17, 2011. These agreements form the basis of the City's breach of contract, promissory estoppel, and indemnification cross-claims against Ford.

Ford asserts it is entitled to summary judgment on the City's breach of contract cross-claim because the City cannot establish that the Hold Harmless Agreements are valid and enforceable contracts. To establish its claim of breach of contract, the City must show: (1) the existence of a contract, whether express or implied, (2) the City's performance, (3) Ford's breach, and (4) the City's damage or loss. *Nexus Commc'ns, Inc. v. Qwest Commc'ns Corp.*, 953 N.E.2d 340, 348 (Ohio Ct. App. 2011) (citations omitted). "To prove the existence of a contract under Ohio law, a party 'must show the elements of mutual assent (generally, offer and acceptance) and consideration.'" *CSX Transp., Inc. v. Occidental Chem. Corp.*, 65 F. App'x 963, 966 (6th Cir. 2003) (citing *Nilavar v. Osborn*, 711 N.E.2d 726, 732 (Ohio Ct. App. 1998)). Without consideration, there can be no contract. *Brads v. First Baptist Church of Germantown, Ohio*, 624 N.E.2d 737, 743 (Ohio Ct. App. 1993). "Consideration is basically something given or promised – quid pro quo – a bargained-for legal benefit or detriment given in exchange." *Mtge. Network, Inc. v. Ameribanc Mtge. Lending, L.L.C.*, 895 N.E.2d 917, 921-22 (Ohio Ct. App. 2008) (citing *Minster Farmers Coop. Exchange Co., Inc. v. Meyer*, 884 N.E.2d 1056, 1061 (Ohio 2008)).

45

> To constitute consideration, the benefit or detriment must be 'bargained for.' Something is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise. The benefit or detriment does not need to be great. In fact, a benefit need not even be actual, as in the nature of a profit, or be as economically valuable as whatever the promisor promises in exchange for the benefit; it need only be something regarded by the promisor as beneficial enough to induce his promise. Generally, therefore, a court will not inquire into the adequacy of consideration once it is found to exist.

*Bono v. McCutcheon*, 824 N.E.2d 1013, 1017 (Ohio Ct. App. 2005).

Ford contends that the City has failed to show that the Hold Harmless Agreements are supported by "bargained-for" consideration, a necessary element to its breach of contract claim. Ford asserts that the agreements were submitted voluntarily and without the City's request pursuant to Ford's standard impound procedure. (Doc. 120, Ex. A, ¶¶ 10-11, Affidavit of Barbara Burton). Ford representative Barbara Burton states:

> Because seizing authorities often need to release a seized vehicle to one of the many third-party repossession companies that Ford Credit uses around the country, Ford Credit typically executes Form 877-4, or the Hold Harmless Agreement, and provides it to the seizing authority. Form 877-4 informs a seizing authority that Ford Credit will hold the authority harmless for damage to the vehicle that takes place after the authority releases the vehicle to the third-party repossession company.

> In the Right-Now situation, the City did not request that Ford Credit provide it with Form 877-4, but Ford Credit provided Form 877-4 to the City as a matter of standard impound procedure. Essentially, by using Form 877-4, Ford Credit notified the City that it would hold the City harmless for damages that resulted to the Trucks upon the City's release of the Trucks to Automobile Recovery, one of the third-party repossession companies that Ford Credit uses in Ohio.

(Doc. 120, Ex. A, ¶ 11).[20] Ford maintains that this lack of "bargained-for" consideration is fatal to the City's breach of contract cross-claim and supports granting summary judgment in its favor. (Doc. 120 at 13-14; Doc. 124 at 6-7).

---

[20]The Court may look to extrinsic evidence to determine whether the Hold Harmless Agreements are supported by consideration. *See Viking & Worthington Steel Ents., L.L.C. v. James*, No. 2010-G-2971, 2011 WL 1345131, at * 5 (Ohio Ct. App. Apr. 8, 2011).

The City argues that the Hold Harmless Agreements are valid contracts supported by "bargained-for" consideration.  In support, the City cites to the plain language of the agreements which reflect an express promise by Ford to indemnify the City in exchange for the release of the trucks to Ford.  The City also cites to Ford's call logs from February 15, 2011 – the day before the agreements were executed – which reflect that Detective Kelley of the Blue Ash Police Department requested the Hold Harmless Agreements, supporting a finding that they are supported by "bargained-for" consideration and, thus, are valid and enforceable contracts.  (Doc. 123 at 3-5; Doc. 130 at 4-5).

Whether the City requested the Hold Harmless Agreements in exchange for release of the trucks is a disputed question of fact in light of the conflicting evidence presented by the parites. Nevertheless, even assuming, *arguendo*, that the Hold Harmless Agreements are supported by consideration and are therefore valid and enforceable contracts, Ford is entitled to summary judgment on the City's breach of contract claim.

The City's breach of contract claim is premised on Ford's refusal to defend the City against plaintiff's due process claim.  (Doc. 75, ¶¶ 18-19).  As discussed above, the City's breach of contract cross-claim rests primarily on its interpretation of the Court's November 2012 Order. *See* Doc. 121 at 6-7; Doc. 123 at 7.  The Court declines to revisit this argument except to reiterate that the November 2012 Order does not, as the City maintains, equate to a binding determination that Ford is required to indemnify the City for defending against plaintiff's due process claims. *See McKenzie*, 219 F.3d at 513; *Serran*, 2008 WL 4791677, at *3.  As the City does not raise any other argument on this issue, the Court now turns to Ford's arguments.

Ford asserts that even if the Hold Harmless Agreements are valid and enforceable contracts, Ford is entitled to summary judgment on the breach of contract cross-claim because

the City cannot establish that Ford breached the Hold Harmless Agreements. Ford contends that the unambiguous language of the agreements forecloses the City's cross-claim because Right-Now's due process claim does not arise out of the City's release of the trucks, but from the City's failure to give notice prior to the release. Ford further contends that a determination that it must indemnify the City for a constitutional violation would render the agreements void as a matter of public policy. (Doc. 120 at 13-16; Doc. Doc. 124 at 7-9).

The City maintains that the plain language of the Hold Harmless Agreements establishes that Ford's duty to indemnify encompasses Right-Now's due process claim. In support, the City notes that the agreements obligate Ford to indemnify and hold the City harmless "for *any liability or claim* made against [the City] *arising out of* [the City's] releasing of the [trucks]. . . ." (Doc. 106, Exhs. 11, 12) (emphasis added). The City asserts that under Ohio law, the term "arising out of" is construed broadly and "indicates a requirement of a causal relationship but not one of proximate cause." (Doc. 123 at 6) (quoting *Westfield Ins. Co. v. Factfinder Mktg. Research, Inc.*, 860 N.E.2d 145, 154 (Ohio Ct. App. 2006)). According to the City, there is a clear causal relationship between Right-Now's due process claim and the City's release of the trucks to Ford such that a proper interpretation of the Hold Harmless Agreements includes a finding that Ford must indemnify the City against Right-Now's claim. (Doc. 106 at 6-7).

The issue before the Court is therefore whether Ford's duty to indemnify the City "for any liability or claim . . . arising out of [the City's] release of [the trucks]" under the Hold Harmless Agreements encompasses Right-Now's due process claim. The parties are in agreement that the terms of the Hold Harmless Agreements are clear and unambiguous. *See* Doc. 120 at 14; Doc. 121 at 6. Consequently, the Court must apply the plain language of the agreements in determining their scope and in discerning the intent of the parties. *See Savedoff*,

48

524 F.3d at 763-64. Upon review of the terms of the Hold Harmless Agreements, the Court finds

that they do not obligate Ford to indemnify the City for damages incurred related to Right-Now's

due process claim.

Contrary to the City's contention, Right-Now's due process claim does not "arise out

of" the release of the trucks, but from the City's failure to provide Right-Now prior notice of the

City's intent to transfer possession of the trucks to Ford. Right-Now alleges that the City

violated its constitutional due process rights by "transferring seized property of Right-Now

*without providing Right-Now notice and a reasonable opportunity to be heard.*" (Doc. 36, ¶ 49)

(emphasis added). Right-Now's allegations, viewed in conjunction with the undisputed evidence

of record, clearly indicate that its due process claim is based on the City's *failure to provide*

*notice* that it was releasing the trucks to Ford. Due process law and common sense dictate that

the City's duty to provide notice to Right-Now arose before the trucks were released. *See Harris*

*v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994) ("Generally, the process that is due *before*

the state may deprive an owner of property includes notice to the owner *prior to the deprivation*

and an opportunity for a predeprivation hearing."). In contrast, Ford's obligations under the

Hold Harmless Agreements did not arise until after the trucks were released. Because the City's

alleged constitutional violation – failing to give notice – occurred *before* the trucks were

released, and Ford's obligation to indemnify was not triggered until *after* the trucks were

released, the only reasonable interpretation is that the Hold Harmless Agreements do not obligate

Ford to indemnify the City or defend it from Right-Now's due process claim.

This interpretation is further supported by the agreements' provision regarding the limits

of Ford's liability thereunder. *See Marusa v. Erie Ins. Co.,* 991 N.E.2d 232, 233 (Ohio 2013)

("The meaning of a contract is to be gathered from a consideration of all its parts, and no

provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible.") (internal quotation omitted). The agreements provide that "the liability of [Ford] to [the City], hereunder shall be limited in amount to the value of the vehicle[s] released to Automobile Recovery." (Doc. 106, Exs. 11, 12). The record reflects that the purchase price of the two trucks was approximately $45,000.00 and $53,000.00, respectively. *See* Doc. 106, Ex. 15. This provision ties the limit of Ford's potential liability under the Hold Harmless Agreements directly to the value of the trucks. The plain language of the agreements establishes that Ford's duty to indemnify the City is limited to liability incurred by the City for physical damage to the trucks, which is unrelated to any damage Right-Now would suffer from a due process violation.

The City argues that the phrase "arising out of" is interpreted broadly under Ohio contract law and, accordingly, the agreements' provision that Ford would indemnify it for all claims "arising out of" the release of the trucks should be interpreted as extending to Right-Now's due process claim. In support of this proposition, the City cites to *Westfield Ins. Co. v. Factfinder Mktg. Research, Inc.*, 860 N.E.2d 145, 154 (Ohio Ct. App. 2006) (citing *Stickovich v. Cleveland*, 757 N.E.2d 50, 69) ("The term 'arising out of' has been interpreted broadly under Ohio law to mean 'flowing from,' 'having its origin in,' or 'growing out of.' The phrase indicates a requirement of a causal relationship but not one of proximate cause.")). However, *Factfinder* involved the interpretation of insurance contracts which are strictly construed in favor of the insured. *See id*. at 398, 401. In contrast, the Hold Harmless Agreements are releases between two entities with equal bargaining power, distinguishing *Factfinder* from the instant case.

In any event, even if *Factfinder* controls here, it does not support the City's position. Under *Factfinder*, Ford would be obligated to indemnify the City only if Right-Now's due

process claim was causally related to the City's release of the trucks to Ford. *See Stickovich*, 757 N.E.2d at 69 ("The term 'arising out of' does not require that the conduct be the proximate cause of the injury, only that it be causally related."). Here, the alleged injury – Right-Now's deprivation of due process rights – flowed from the City's failure to give notice that it intended to release the trucks to Ford, not from the release itself. Thus, even under the City's endorsed construction of the term "arising out of," the Hold Harmless Agreements do not contemplate holding Ford liable for Right-Now's constitutional claims. Accordingly, the Court finds that Ford is entitled to summary judgment on the City's breach of contract cross-claim.[21]

4. *The City's Promissory Estoppel Claim*

The City argues that it is entitled to summary judgment on its promissory estoppel claim against Ford because in releasing the trucks to Ford, the City relied on Ford's representations that it would hold the City harmless for any liability arising out of the release, which the City asserts includes its potential liability and damages incurred related to Right-Now's § 1983 claims against it. (Doc. 123 at 13-14). Ford asserts that the City's promissory estoppel claim must be dismissed because such claims are precluded where an agreement by two parties is governed by valid and enforceable contracts, such as the Hold Harmless Agreements. *See* Doc. 120 at 17 (citing *DuBrul v. Citrosuco N. Am., Inc.*, 892 F. Supp.2d 892, 914 (S.D. Ohio 2012)) (holding that promissory estoppel "is not available as a remedy where the legal relationship between the parties is governed by a valid and enforceable contract") (internal citations omitted). However, the Court has determined that there is an issue of fact as to whether the Hold Harmless

---

[21]Ford also argues that it is entitled to summary judgment because the City cannot establish that it breached the agreements because: (1) there has been no determination yet as to the City's liability regarding Right-Now's due process claims; thus, Ford is not under any purported obligation to indemnify the City; (2) the agreements do not require Ford to tender defense on behalf of the City; and (3) the City cannot establish that it has incurred any damages in the absence of a finding of liability. (Doc. 120 at 15). Given the above finding that Ford's duties under the Hold Harmless Agreements do not extend to Right-Now's constitutional claim, the Court declines to address these arguments.

Agreements are supported by consideration and, thus, whether they are valid and enforceable contracts. Accordingly, the City's promissory estoppel claim is not necessarily precluded as argued by Ford and it is necessary to address the City's promissory estoppel claim on its merits.

The elements of a promissory estoppel claim under Ohio law are "(1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise." *Sweitzer v. American Express Centurion Bank*, 554 F. Supp.2d 788, 796 (S.D. Ohio 2008) (quoting *Weiper v. W.A. Hill & Assoc.*, 661 N.E.2d 796, 803 (Ohio Ct. App. 1995)) (internal quotations omitted).

The City's promissory estoppel claim fails because the evidence of record does not establish that Ford made a "clear and unambiguous" promise to indemnify the City for damages related to Right-Now's § 1983 claim. Ford's promises to indemnify the City under the Hold Harmless Agreements relate only to the City's potential liability for physical damage to the trucks resulting from its release of the trucks to Ford's agent. In contrast, the City's potential liability to Right-Now relates to the City's failure to provide notice before the trucks were released; this liability arose prior to Ford's submission of the Hold Harmless Agreements to the City. For the reasons stated above, the Court finds that Ford's promises to indemnify the City under the Hold Harmless Agreements do not encompass any liability incurred by the City arising out of Right-Now's due process claim. Because Ford did not make a clear and unambiguous promise to indemnify the City for liability related to Right-Now's § 1983 due process claim, Ford is entitled to summary judgment on the City's promissory estoppel claim.

5. *Common law indemnification and contribution claims*

The Court further finds that Ford is entitled to summary judgment on the City's common-law indemnification and contribution cross-claims. The City alleges that Ford must indemnify the City, to the extent it is found liable to Right-Now, for any damages suffered by Right-Now related to its due process claim. (Doc. 75, ¶¶ 28-31). The City argues that it is entitled to summary judgment on these cross-claims because Ford is primarily liable for any damages incurred by Right-Now as the trucks were released by the City at Ford's request. (Doc. 121 at 8-9; Doc. 123 at 15).

"The rule of indemnity provides that 'where a person is chargeable with another's wrongful act and pays damages to the injured party as a result thereof, he has a right of indemnity from the person committing the wrongful act, the party paying the damages being only secondarily liable; whereas, the person committing the wrongful act is primarily liable.'" *Satterfield v. St. Elizabeth Health Ctr.*, 824 N.E.2d 1047, 1050 (Ohio Ct. App. 2005) (quoting *Travelers Indem. Co. v. Trowbridge*, 321 N.E.2d 787 (Ohio 1975)). "Without fault, there is no basis for indemnification" because a prerequisite of indemnity is that one party is "chargeable" for the wrongful act of another. *Id.* (internal quotations and citation omitted).

Right-Now's claimed injuries result from the City's alleged failure to provide notice that it was going to release the trucks to Ford – not from the act of releasing the trucks to Ford. Thus, the City is the party with primary liability as it was the only party with a duty to provide notice to Right-Now. As the party with primary liability, the City's indemnification cross-claim fails. *See Satterfield*, 824 N.E.2d at 1051.

The City's contribution claim likewise fails. While the City alleges a joint indemnification and contribution cross-claim, its summary judgment arguments are limited to the

53

indemnification cross-claim. *See* Docs. 121, 123.  Though indemnification and contribution

claims are distinct claims subject to different analyses under Ohio law, the City's arguments treat

them as one.  However, unlike common law indemnification claims, contribution claims are

based in statute.  *See* Ohio Rev. Code §§ 2307.22-2307.23.  "The right of contribution exists

only in favor of a tortfeasor who has paid more than that tortfeasor's proportionate share of the

common liability, and that tortfeasor's total recovery is limited to the amount paid by that

tortfeasor in excess of that tortfeasor's proportionate share."  Ohio Rev. Code § 2307.25(A).

Thus, the right of contribution is a legal concept that applies only to joint tortfeasors. *See St.*

*Paul Fire & Marine Ins. Co. v. Cassens Transport Co.*, 86 F. App'x 869, 871-72 (6th Cir. 2004)

(applying Ohio law).  The City has presented no evidence that Ford is a joint tortfeasor for

purposes of its contribution cross-claim.  Consequently, the City's contribution claim fails as a

matter of law.

    For the reasons stated herein, the undersigned finds that Ford is entitled to summary

judgment in its favor on the City's cross-claims for breach of contract, promissory estoppel, and

indemnification and contribution.

## V. Conclusion

    For the reasons stated above, **IT IS HEREBY RECOMMENDED THAT**:

    (1) Right-Now's motion for partial summary judgment on its due process claims against
        the City (Doc. 94) be **GRANTED**;

    (2) Ford's motion for summary judgment (Doc. 120) be **GRANTED**;

    (3) the City's motion for summary judgment on its cross-claims (Doc. 121) be **DENIED**;
        and

(4) the City's motion for summary judgment on plaintiff's due process claims (Doc. 122) be **DENIED**.

Date: _10/1/14_

_Karen L. Litkovitz_
Karen L. Litkovitz
United States Magistrate Judge

55

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

RIGHT-NOW RECYCLING, INC.,                          Case No. 1:11-cv-364
     Plaintiff,

                                           Weber, J.
     vs.                                             Litkovitz, M.J.

FORD MOTOR CREDIT CO., *et al.*,
     Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).